AO 106 (Rev. 04/10)  Application for a Search Warrant

AUTHORIZED AND APPROVED/DATE: Jason Harley 5/29/24

# UNITED STATES DISTRICT COURT

### for the

### Western District of Oklahoma

*a m6n*
*5/29/24*

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

**Premises known as 4037 NW 19th Street, Oklahoma
City, Oklahoma 73107, the surrounding curtilage, and
any vehicles, garages, and outbuildings thereon**

) 
) 
) 
) Case No. M-24 **472** -AMG
) 
) 

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**See Attachment A**

located in the _____ **Western** _____ District of _____ **Oklahoma** _____, there is now concealed *(identify the person or describe the property to be seized):*

**See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C § 846 | Drug Conspiracy |
| 21 U.S.C. § 841(a) | Possession with Intent to Distribute and Distribution of Controlled Substances |

The application is based on these facts:

**See attached Affidavit of FBI SA Marc Jones**

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

**Marc Jones, Special Agent, FBI**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **5/29/24**

*Judge's signature*

City and state: **Oklahoma City, Oklahoma**

**Amanda Maxfield Green, U.S. Magistrate Judge**
*Printed name and title*

## WESTERN DISTRICT OF OKLAHOMA
## OKLAHOMA CITY, OKLAHOMA

STATE OF OKLAHOMA )
)
COUNTY OF OKLAHOMA )

### <u>AFFIDAVIT</u>

I, Marc Jones, Special Agent with the Federal Bureau of Investigation (FBI), having been duly sworn, depose and state as follows:

1.     I have been a Special Agent with the FBI since April 2021.  I am currently assigned to the Oklahoma City Division, where I am assigned to the Criminal Enterprise Squad, which is responsible for investigating street gang and drug-related offenses.  Since becoming a Special Agent, I have been trained in a variety of investigative matters which involved the unlawful distribution of narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 846.

2.     Prior to joining the FBI, I was a Child Protective Services Specialist from October 2015 to March 2021.  In that capacity, I investigated allegations of child abuse and/or neglect and reported the findings of my investigations to the District Attorney's Office. Through my training and experience, I have become familiar with the methods and operation of drug distributors, including their common organizational structures, use of violence, methods of distributing, storing, and transporting drugs, and methods of collecting and laundering drug proceeds. As part of my investigative experience as an FBI Special Agent, I have

1

been the affiant in multiple Title III wire intercept affidavits, executed search and arrest warrants, conducted physical surveillance, coordinated controlled purchases with confidential sources, analyzed records documenting the purchase and sale of illegal drugs, and spoken with informants and subjects, as well as other local and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs.

3.     The facts set forth below are based upon my own personal observations, reports and information provided to me, the Oklahoma City Police Department (OCPD), or the FBI by other law enforcement agents, and other documents obtained during the course of this investigation.  All of the below-described dates, times, and drug and currency amounts are approximate.

4.     The information contained in this Affidavit is submitted for the limited purpose of establishing probable cause to secure search warrant for 4037 NW 19th Street, Oklahoma City, Oklahoma 73107 (the **SUBJECT RESIDENCE**), as described further in **Attachment A** (physical description), to include the surrounding curtilage and any vehicles, garages, or outbuildings located thereon, for evidence of violations of 21 U.S.C. § 841(a)(1) (manufacturing, possessing, distributing and selling of controlled substances) and 21 U.S.C. § 846 (drug conspiracy), as described further in **Attachment B** (description of items to be seized).  Since this Affidavit is being submitted for the limited purpose of

2

securing a search warrant, I have not included each and every fact known to me concerning this investigation.   I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrants.

## BACKGROUND REGARDING DRUG CASES

5.     As discussed previously, based on my training, experience, and consultation with other seasoned drug investigators, I am familiar with the *modus operandi* of drug traffickers.   Based on my training and experience, as well as my participation in numerous drug-related investigations, I know the following:

a)     I am aware that drug dealers frequently keep assets, records, and documents related to their drug distribution organizations, and monies derived from the sale of illegal drugs, in their own residences, as well as in safe houses where they are not easily detectable by law enforcement officials conducting investigations.   Further, I am aware that these individuals will frequently maintain these houses in the name of other individuals, also to avoid detection by law enforcement agencies;

b)     I am aware that even though relevant assets, telephones, and properties are often held in alias or third-party names, drug dealers continue to use and exercise dominion and control over them;

c)     I am aware that drug dealers often maintain on-hand quantities of currency and drugs in order to finance their ongoing drug business;

d)     I am aware that drug dealers maintain books, records, receipts, notes,

3

ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances, even though such documents may be in code. It is particularly common that individuals engaged in drug trafficking will keep ledgers related to their illegal activity because drug dealers commonly "front" drugs (provide controlled substances on consignment) to their clients, and are frequently "fronted" drugs by their own sources of supply as part of their dealing operations;

e)     I am aware that the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the drug dealers have ready access to them, i.e., homes, automobiles businesses and safe houses, and that the most common place for these items to be located is at their primary residence;

f)     I am aware that drug dealers will frequently keep records, notes, ledgers, contact lists, and other evidence of their drug trafficking on cellular phones, and that they often keep such cellular phones on their person or in the properties that they control. Further, I am aware that drug dealers will often have multiple cellular phones, and will frequently use more than one cellular phone to help conduct their drug trafficking. I am also aware that drug dealers will use computers and tablets to further their drug trafficking through the use of digital communication, including, but not

4

limited to, e-mail and instant messaging;

g)     I am aware that it is common for drug dealers to conceal contraband, proceeds of drug sales, and records of drug transactions, drug sources and drug customers, in secure locations within residences, garages, storage building, safes, and safety deposit boxes for ready access, and also to conceal such items from law enforcement agencies;

h)     I am aware that when drug dealers acquire large sums of proceeds from the sale of drugs, they attempt to legitimize their profits;

i)     I am aware that to accomplish these goals, drug dealers utilize, among other things, banks and their attendant services, securities, cashier checks, money drafts, letters of credit, brokerage houses, real estate companies, shell corporations, and business fronts;

j)     I am aware that drug dealers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in the drug dealers organization, even if said items may be in code;

k)     I am aware that drug dealers commonly take photographs (or cause photographs to be taken) of themselves, their associates, their property and their products, and that these dealers usually maintain these photographs in their possession and at their residence; and

l)     I am aware that firearms are commonly used by drug dealers to

protect their inventory and currency.

## PROBABLE CAUSE

6.     In October of 2022, Special Agents and Task Force Officers (TFOs) assigned to the FBI initiated a joint investigation targeting Carlos Villanueva (VILLANUEVA) —whom law enforcement believed to be part of a drug trafficking organization (DTO) that distributed cocaine in the Oklahoma City area.   After multiple controlled drug buys and the execution of search warrants, VILLANUEVA was arrested by the FBI in November of 2023.   During May 2023, ~~2023~~ *2024 amj* VILLANUEVA and his codefendant, Destin O'Neil, both pled guilty in case CR-23-480-R.

7.     During the VILLANUEVA investigation, agents learned that Luis Hernandez Dominguez (DOMINGUEZ) was an associate of VILLANUEVA and also a potential drug-trafficker.   In April of 2024, investigators continued the investigation into DOMINGUEZ's role within the DTO and whether he might be the possible replacement for VILLANUEVA. Not only had DOMINGUEZ replaced VILLANUEVA, but he also now had his own associate/ employee – Antonio MARQUEZ (MARQUEZ).   During the earliest portions of the investigation into DOMINGUEZ, law enforcement attempted to coordinate a controlled buy of cocaine from DOMINGUEZ.   While DOMINGUEZ certainly confirmed that he had cocaine for sale, he would not sell smaller than half kilogram quantities of cocaine.   It is rare to conduct controlled purchases in these amounts because a

6

kilogram of cocaine because it is so cost prohibitive – usually $25,000 - $30,000 in Oklahoma. However, DOMINGUEZ informed CS1 that he had someone who worked for him, MARQUEZ, that would break DOMINGUEZ's cocaine down to sell in smaller quantities and DOMINGUEZ would put CS1 in contact with him.[1]

8.     In the first half of April 2024, law enforcement used a confidential human source (CS1)[2] to purchase cocaine from MARQUEZ. CS1 communicated directly with MARQUEZ via telephone, and he/she agreed to meet with MARQUEZ in Oklahoma City to exchange ounce quantities of cocaine (roughly $1,000 per ounce) for an agreed upon price. CS1 met with MARQUEZ at the pre-determined meeting location, which was set by MARQUEZ and located near the

---

[1]     MARQUEZ has verbally confirmed his business relationship with DOMINGUEZ.  Agents have conducted extensive surveillance, both physical and electronic, on DOMINGUEZ and MARQUEZ and the two do not appear to have any normal interactions or relationship outside of their roles and involvement in this DTO.

[2]     CS1 was not promised anything in exchange for his/her cooperation but has received two monetary payments for his/her services, the most recent payment being in December of 2023. Additionally, CS1 has received immigration benefits in exchange for his/her services. Information provided by CS1 has been reliable to the best of my knowledge, and I am unaware of any false information provided by VS1. Information herein attributed to CS1, unless otherwise noted, was obtained by CS1 through his/her personal observations and conversations with targets of this investigation and their associates.

**SUBJECT RESIDENCE**, and exchanged the money for the cocaine.[3] During this controlled buy, MARQUEZ informed CS1 that the drugs he sold came from DOMINGUEZ.

9.      During the first half of May 2024, law enforcement used CS1 to conduct a second controlled drug buy of cocaine from MARQUEZ.   CS1 contacted MARQUEZ at his telephone number, 405-532-4455, and coordinated the purchase of ounce quantities of cocaine for an agreed upon price. At the same time CS1 was coordinating the deal, investigators established surveillance on MARQUEZ who was away from the **SUBJECT RESIDENCE** at that time.   Just minutes after the two coordinated the deal, investigators continued surveillance on MARQUEZ and watched him travel back to the **SUBJECT RESIDENCE**.

10.    MARQUEZ was inside the **SUBJECT RESIDENCE** for approximately eight minutes before returning to his vehicle and departing. After MARQUEZ left the **SUBJECT RESIDENCE**, he sent the location for the controlled drug buy to CS1. Investigators continued surveillance on MARQUEZ and observed him arrive at the meet location.   When CS1 arrived at the same location, investigators watched MARQUEZ exit his vehicle, get into CS1's vehicle,

---

[3]      The substance provided by **MARQUEZ** field tested positive for cocaine. During the controlled buy, CS1 was equipped with an FBI-issued recording device, and the recording is maintained by the FBI.

and the two completed the cocaine transaction.[4]

11.     Based on my training and experience I am aware that drug distributors rarely take their drugs with them everywhere they travel in their vehicle.   They will usually store the drugs at a secure location and then retrieve drugs from that location when a customer requests to buy the product. On the day of the second controlled buy of cocaine, MARQUEZ was not at the **SUBJECT RESIDENCE** when CS1 contacted him.   However, when the two finalized the terms of the cocaine deal, MARQUEZ immediately went back to the **SUBJECT RESIDENCE**.   Given the short amount of time MARQUEZ was inside the **SUBJECT RESIDENCE** and the fact that he went directly from the **SUBJECT RESIDENCE** to the meeting location, I believe that MARQUEZ had to return to the **SUBJECT RESIDENCE** to retrieve the cocaine before he could meet CS1 for the transaction.

12.     On May 6, 2024, law enforcement observed what appeared to be a drug transaction between DOMINGUEZ and MARQUEZ, based on my knowledge of their relationship and my training and experience. This transaction was very similar to the types of transactions that took place between VILLANUEVA and DOMINGUEZ prior to VILLANUEVA's arrest.   At approximately 5:01 p.m.,

---

[4]     The substance provided by **MARQUEZ** field tested positive for cocaine. During the controlled buys, CS1 was equipped with an FBI-issued recording device, and the recording is maintained by the FBI.

agents received data from the judicially authorized GPS tracker on MARQUEZ's Chevrolet Silverado.   That data showed that MARQUEZ arrived near 11728 SW 3rd St., Yukon, Oklahoma – DOMINGUEZ's residence. Agents also had a pole camera focused on DOMINGUEZ's residence, so they verified MARQUEZ's arrival.

13.    When MARQUEZ arrived, DOMINGUEZ was outside of his residence, and he was inside the truck of a man who had just arrived at his house a few minutes prior.   That man was later identified as Hector MALDONADO. Using the pole camera feed, agents watched MARQUEZ park his truck in the street behind MALDONADO's truck, but MARQUEZ did not get out of his vehicle. Once MARQUEZ parked, DOMINGUEZ got out of MALDONADO's truck and then went inside of his house.   Two minutes later, DOMINGUEZ exited his house carrying a box in his left hand and then he walked to MARQUEZ's truck.

14.    Shortly after, DOMINGUEZ, now empty handed, went back to MALDONADO's truck and MARQUEZ departed the residence.   The GPS tracker data on MARQUEZ's truck showed that when he left DOMINGUEZ's residence, he went directly to the **SUBJECT RESIDENCE**.   When MARQUEZ arrived at the **SUBJECT RESIDENCE**, he exited his vehicle and entered his residence carrying what appeared to be the same box that DOMINGUEZ just brought to him while MARQUEZ was parked outside DOMINGUEZ's residence.

15.    Based on my training and experience and knowledge of their roles in

10

the DTO, I believe that on May 6, 2024, MARQUEZ traveled to DOMINGUEZ's residence to obtain more cocaine. DOMINGUEZ provided MARQUEZ with a box which contained the cocaine and MARQUEZ departed. MARQUEZ immediately returned to the **SUBJECT RESIDENCE** and brought the box that he received from DOMINGUEZ inside the **SUBJECT RESIDENCE**.

16.     On May 27, 2024, there was a similar pickup between MARQUEZ and DOMINGUEZ. At approximately 8:39 p.m., the GPS tracker data on MARQUEZ's truck showed that he had just arrived at DOMINGUEZ's residence, and the pole cameras confirmed this. At approximately 8:40 p.m., DOMINGUEZ exited his house carrying a black bag and he took that bag to where MARQUEZ was parked outside the house.   Just 40 seconds later, DOMINGUEZ went back inside the house, and he was not carrying the black bag. MARQUEZ immediately left the area and the GPS tracker data showed that he headed east towards the **SUBJECT RESIDENCE** where he ultimately arrived at 9:09 p.m.[5]

---

[5]     MARQUEZ made one 10-minute stop at a grocery store at 23rd and Meridian while on his way home.   Also, of note, MARQUEZ took Reno Avenue all the way from Yukon to the **SUBJECT RESIDENCE**.   It is unlikely that route was chosen due to the grocery store stop because MARQUEZ turned north onto Meridian from Reno and he could have just taken I-40 to the Meridian exit, which would have saved significant time. I believe MARQUEZ wanted to avoid the drug interdiction teams known to patrol that portion of I-40.   Additionally, given the position of the parked cars at the **SUBJECT RESIDENCE**, the pole camera could not clearly capture MARQUEZ entering the **SUBJECT RESIDENCE**.   So, it is unknown if MARQUEZ took the package he received from DOMINGUEZ inside the house as he did previously. However, the cameras briefly captured his wife exiting the truck with grocery

17.     Based on my training and experience and knowledge of their roles in the DTO, I believe that on May 27, 2024, three weeks after his last trip to DOMINGUEZ's residence, MARQUEZ returned for a resupply of cocaine. MARQUEZ arrived at DOMINGUEZ's residence where DOMINGUEZ provided him with a quantity of cocaine, concealed in a black bag, which MARQUEZ brought back to his residence as he had done before.

18.     Based on my training and experience and the events during this investigation, as put forth in this Affidavit, I believe that MARQUEZ is a part of a DTO and is involved in the distribution of cocaine within the Western District of Oklahoma. Moreover, based on my training and experience as well as the events outlined in this Affidavit, I believe that MARQUEZ is storing the cocaine and the fruits and instrumentalities from his cocaine distribution at the **SUBJECT RESIDENCE.**

## CONCLUSION

19.     Based on the foregoing, I respectfully submit that there is probable cause to believe that evidence relating to violations of 21 U.S.C. §§ 841(a) and 846 will be found at the **SUBJECT RESIDENCE.**   I therefore respectfully request issuance of a search warrant for the **SUBJECT RESIDENCE** (as set forth in **Attachment A**) based on the above-mentioned facts.

---

bags and entering the house. She was not carrying the black bag from DOMINGUEZ.

**FURTHER, YOUR AFFIANT SAYETH NOT.**

MARC JONES
SPECIAL AGENT
Federal Bureau of Investigation

Sworn to and subscribed before me this 29th day of May, 2024.

AMANDA MAXFIELD GREEN
United States Magistrate Judge

13

## Attachment A

### PROPERTY TO BE SEARCHED

4037 NW 19th Street, Oklahoma City, Oklahoma 73107
**(Subject Residence)**



4037 NW 19th Street, Oklahoma City, Oklahoma, is a single-family residence constructed with light brown brick and white siding. The residence has a brown composition roof that overhangs the front porch. There is a single car garage facing NW 19th Street. The garage has a significant amount of a green ivy like plant covering it.

## Attachment B

### ITEMS TO BE SEIZED

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a) and 846, which seizure is limited to those individuals reasonably related to or directly involved in said violations, namely:

1.  Items used in the illegal distribution of controlled substances, including, but not limited to, scales, food supplements used for diluting illegal drugs, baggies, spoons, mirrors, straws or other utensils used in the packaging or use of illegal drugs.  Also, items typically associated with illegal drug distribution, including firearms, ammunition, silencers, and receivers.

2.  Documents, records, or materials related to the distribution of illegal drugs, including, but not limited to: ledgers, address books, telephone books, telephone bills, telephone records, rent receipts, rental car agreements, mini-storage receipts and keys, cellular telephone agreements, bills and receipts related to cellular telephones, and any property and/or U.S. currency being proceeds of or related to the distribution of illegal drugs.  Also ledgers containing quantity of drugs possessed, ledgers of money owed to the suspects for drugs they have provided to co-conspirators, ledgers of money owed by the suspects to their suppliers, transportation and distribution instructions for the drugs being sold, and other types of documentation regarding the sale of drugs.

1

3.    Financial documents evidencing the illegal distribution of controlled substances, including, but not limited to: bank statements, bank deposit slips, canceled checks, money orders, money order receipts, wire transfer receipts, stored value cards, handwritten notes depicting monies owed for illegal controlled substances, documents showing purported income, and any other evidence showing monetary records of the illegal distribution of controlled substances.

4.    Documents, records, or materials related to the laundering of drug money, including, but not limited to: wire transfer receipts, bank deposit slips, bank withdraw slips, money order receipts, records detailing the purchase of property, items which show control of real property placed in nominee names such as utility payment records, property tax payment records, key to real property, receipts from payment of insurance premiums paid on residences/vehicle.

5.    The fruits and proceeds of the illegal distribution of controlled substances, including, but not limited to: large amounts of currency, financial instruments and other items of value showing the spending of large sums of money made from engaging in the illegal distribution of controlled substances, or other illegal activities.

6.    Any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized, and forensic copies thereof.

a.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

7.    Items which tend to show dominion and control of the property searched, including, but not limited to, utility bills, telephone bills, correspondence, rental agreements, property tax payment records, receipt from the payment of insurance premiums on the residence, photographs, and other identification documents.